| UNITED STATES DISTRICT COURT | NOT FOR PUBLICATION |
| EASTERN DISTRICT OF NEW YORK | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

EDWARD PINKNEY,

                Petitioner,

                                **MEMORANDUM AND ORDER**
     -against-                        09-CV-1590(ERK)

DALE ARTUS, Superintendent,
Clinton Correctional Facility,

                Respondent.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

KORMAN, J.:

      Edward Pinkney ("Pinkney") seeks habeas corpus relief from his 2004 conviction for murder in the second degree and attempted murder in the second degree. After a jury trial, Pinkney was sentenced, as a predicate felon, to two consecutive terms of imprisonment of twenty-five years to life for the murder conviction and twenty-five years for the attempted murder conviction. Each of the four issues raised in the petition is without merit. Accordingly, the petition is denied.

**Background**

      Pinkney's conviction arises out of an attempted robbery of PJ's Split Ends Barbershop ("the barbershop") at 379 Bushwick Avenue in Brooklyn. On April 3, 2003, at 11:45 p.m., Pinkney entered the premises, pulled out his gun, and aimed it at the store owner's brother, Kwame Buckner ("Kwame"). He ordered everyone to get down on the floor. Pinkney proceeded to shoot Kwame in the head and arm. Then, Perry Buckner ("Perry"), the store owner, darted to the backroom to grab his own gun. Pinkney chased after Perry and a shootout erupted. Perry suffered a gunshot wound to the chest. Pinkney was struck six times in the

groin, but managed to escape. Perry then called the police. An ambulance took the brothers to the hospital. Perry survived the shooting while Kwame lapsed into a coma and ultimately died about twenty days later from his gunshot wound to the head.

Twenty minutes after the shootout, at approximately 12:05 a.m. on April 4, 2003, Police Officer Daniel Houlahan received a radio call alerting him that a male with a gunshot wound was receiving medical care at a nearby hospital. The call directed him to Interfaith Hospital in Bedford-Stuyvesant, Brooklyn. Within minutes, Office Houlahan arrived at the hospital emergency room and came across a man with several shots to the groin, whom he identified as Edward Pinkney.

About a half-hour later, Detective Michelle Mosley of the 81st Precinct arrived at the hospital to question Pinkney about his gunshot wounds. Pinkney told Detective Mosley that a group of young people wearing red gang colors, whom he presumed were members of the Bloods, shot him and tried to take his red leather jacket near Fulton Street and Utica Avenue. He then claimed that a truck driver found him and drove him to the hospital. Pinkney then indicated that he did not wish to answer any more questions. Because neither Detective Mosley nor Officer Houlahan was aware of the attempted armed robbery at the barbershop, the interview ended.

Later that day, Detective Mosley reviewed the hospital surveillance tapes from the previous evening and discovered footage of a car leaving Pinkney at the hospital. The recording contradicted Pinkney's statement to the Detective that a truck had taken him to the hospital. Subsequently, she checked to see if Pinkney had a criminal record and learned that Pinkney had been previously arrested for robbery, gun possession, and drug related crimes. She contacted

surrounding precincts and learned from Detective Fonteboa of the 90th Precinct that he was investigating a shooting at the barbershop.

The next day, Detective Mosley returned to Interfaith Hospital to continue interviewing Pinkney. She did not on that occasion confront Pinkney about the discovery she had made watching the hospital surveillance footage or question him about the shooting at the barbershop. Pinkney again maintained that he had been shot by members of the Bloods gang while going to visit his brother, and that a passing truck driver dropped him off at the hospital. Detective Mosley left without placing Pinkney under arrest. She ultimately turned the investigation over to Detective Fonteboa and Detective Baker of the Brooklyn North Homicide Squad.

Several days later, on April 8, 2003, Detective Fonteboa showed Perry a photographic array with Pinkney as its subject. Perry identified Pinkney as the gunman who attempted to rob the barbershop. Nearly a month later, on May 2, 2003, a second eyewitness also identified Pinkney from a photographic array.

On May 16, 2003, as Pinkney was leaving the hospital with his mother, Detective Baker and Detective Fonteboa picked up Pinkney and transported him to the 90th Precinct for questioning. When Detective Fonteboa explained to Pinkney that they wanted to talk to him because he had been identified as the gunman in an attempted robbery of a barbershop, neither Pinkney nor his mother requested an attorney. The Detectives brought Pinkney to an interview room, and, prior to questioning, Detective Baker read Pinkney his *Miranda* rights. As Detective Baker read the third *Miranda* warning, Pinkney asked if he needed a lawyer. Detective Baker told Pinkney that the decision was his to make. Pinkney then asked how long it would take to get him a lawyer. Detective Baker replied that he could not answer the question because that was

3

something out of his control. Pinkney then told both Detectives Baker and Fonteboa that he just wanted to get the interview over with.

After Detective Baker finished reading Pinkney his *Miranda* rights, he asked Pinkney about the events that occurred during the late hours of April 3, and early morning hours of April 4, 2003. Pinkney told the detectives "that he was walking down the street, he was met by several guys, male blacks and male Hispanics. They walked up to him, they bumped him and then he said next thing they start hitting him. They hit him in the head and he said all of a sudden they started shooting. He says he started running and the next thing he knew he was at the nearest hospital." H. 37–38. When asked by the Detectives if he had any knowledge of the barbershop shooting, Pinkney denied ever setting foot in Bushwick on the night of the shooting and denied ever hearing of the barbershop.

Pinkney agreed to write his statement and to repeat his version of events to an Assistant District Attorney. After receiving a legal pad and pen from Detective Baker, Pinkney spent the next forty-five minutes alone writing his statement. When Detective Baker returned to the room, Pinkney handed him a three-page statement, which repeated the same story Pinkney told them during the oral interview. Pinkney also wrote that, following his discharge from the hospital, the police had taken him into custody to question him about the barbershop shooting, and that he had "asked the detectives for a lawyer and they said I did not need one because all they want to do was ask some questions and I would be sent home." H. 43–44. Before signing his name, Pinkney concluded by writing, "I do not own any firearms and I definitely didn't shoot anyone." H. 44.

A few hours later, at about 3:36 a.m., a video camera recorded a conversation between an Assistant District Attorney and Pinkney in which Pinkney claimed to have had requested a lawyer during his initial oral interview with police.

Early the next morning, at about 1:50 a.m., Detective Fonteboa assembled a double-blind line up with Pinkney as the subject. Detective Philip Palmieri of the 73rd Precinct, who did not know that Pinkney was the lineup's subject, escorted Perry, who had previously identified Pinkney in a photographic array, into a room to view the lineup. Perry identified Pinkney as the person who had shot him in the barbershop. Pinkney was then placed under arrest.

After Pinkey's various pre-trial motions to suppress post-arrest statements were denied, Pinkney went to trial. In his testimony at trial—as well as in this *habeas* petition—Pinkney offered an alternative account of how he was wounded on the night of the barbershop shooting. He no longer claimed to have been shot in Bedford-Stuyvesant, but now claimed to have been an innocent bystander in the barbershop on the night of the shooting. Indeed, he now alleged to have merely entered the barbershop moments before the robbery to buy a pack of cigarettes. He contended that when gunfire erupted, Perry mistakenly shot him instead of the robber. As a result, according to Pinkney, Perry identified him to the police as the assailant either out of confusion or with the intention of protecting himself for shooting the wrong man. On cross-examination, the prosecutor challenged Pinkney's credibility, highlighting the discrepancy in his initial statement to police with his trial testimony.

The jury convicted Pinkney of murder in the second degree, N.Y.P.L. § 125.25(3) (felony murder), and attempted murder in the second degree, N.Y.P.L. §§ 110/125.25(1), but acquitted him of murder in the first degree, N.Y.P.L. §125.27(1)(a)(vii). Subsequently, Pinkney was sentenced, as a predicate felon, to consecutive terms of imprisonment of twenty-five years to life

for the murder conviction and twenty-five years for the attempted murder conviction. The judgment of conviction was affirmed by the Appellate Division. *People v. Pinkney,* 852 N.Y.S.2d 306 (N.Y. App. Div. 2008), *leave to appeal denied by People v. Pinkney*, 10 N.Y.S.2d 402 (N.Y. 2008).

**DISCUSSION**

The petition for a writ of habeas corpus raises four grounds for relief. Each is without merit.

(1) Pinkney claims that the that the prosecutor's summation as well as her cross-examination of him, in which she attacked his credibility, deprived Pinkney of his constitutional right to a fair trial. Because Pinkney did not object to the statements of the summation and questions during cross-examination, the Appellate Division held that Pinkney's claim was procedurally barred. *Pinkney,* 852 N.Y.S.2d at 307. While this provides a sufficient basis for rejecting his claim here, Pinkney's argument is also without merit. The prosecutor had good reason to question Pinkney's credibility because Pinkney gave conflicting accounts of the origin of his injuries in his pre-trial statement and testimony at trial. Accordingly, the "prosecutor's questions and comments on summation [and cross-examination] were legitimate impeachment of [Pinkney's] testimony, and once a defendant takes the stand, he is subject to [impeachment of his] credibility just like any other witness." *Portuondo v. Agard,* 529 U.S. 61, 70 (2000).

(2) Pinkney's challenge to the imposition of consecutive sentences fails because there is "[n]o federal constitutional issue . . . presented where, as here, the sentence is within the range prescribed by state law." *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992). Indeed, "there is 'no constitutionally cognizable right to concurrent, rather than consecutive, sentences.'" *United*

*States v. McLean,* 287 F.3d 127, 136–37 (2d Cir. 2002) (quoting *United States v. White,* 240 F.3d 127, 135 (2d Cir. 2001)). In any event, because the sentence imposed for the murder and the sentence imposed for the attempted murder involved two discrete crimes against different persons, and because of his prior criminal conduct, including involvement in an armed robbery, the sentence imposed was reasonable.

(3) Pinkney's Fourth Amendment claim that he was arrested without probable cause and identified as the gunman by an unreliable witness is barred by the holding of *Stone v. Powell*, 428 U.S. 465 (1976). This claim is also without merit.

(4) Pinkney's *Miranda* claim warrants more discussion. Pinkney made three statements prior to his arrest. A fourth statement recorded on video was not used at trial. Neither was a confession. Instead, they were inconsistent false exculpatory statements. The first two statements, as the trial judge correctly held, were not made while he was in custody. Pinkney was not formally arrested, nor was he subject to "restraint on freedom of movement of the degree associated with a formal arrest." *Yarborough v. Alvarado*, 541 U.S. 652, 662 (2004); s*ee, e.g., U.S. v. Jamison,* 509 F.3d 623 (4th Cir. 2007); *see also U.S. v. Martin*, 781 F.2d 671, 672 (9th Cir. 1985). While there is arguably an issue of credibility over whether Pinkney specifically asked for an attorney before making his third exculpatory statement, that issue is resolved by the finding of the Appellate Division that "[e]ven crediting [Pinkney's] statement that he requested a lawyer, the uncontroverted testimony established that the defendant thereafter clearly and unambiguously negated those very words" by continuing to speak with police. *Pinkney,* 852 N.YS.2d at 307 (quoting *People v. Glover*, 637 N.Y.S.2d 683, 661 (N.Y. 2000)). This finding is clearly entitled to deference, 28 U.S.C. §2254(d)(1)–(2), particularly because

Pinkney did not testify at the suppression hearing and the conflict was created by a hearsay statement in the written and videotaped version of his oral statement.

In any event, the admission of the latter statement was harmless. While Pinkney would have been entitled to preclude the use of that statement on the prosecution's case, once he took the stand, as he did, any false exculpatory statements were clearly admissible to impeach his credibility even if they were taken in violation of *Miranda*. *See Harris v. New York*, 401 U.S. 222 (1971). Moreover, the statements Pinkney made in the hospital, which did not implicate *Miranda*, were inconsistent with his trial testimony. Of course, if Pinkney had not taken the stand, the evidence against him, including the eyewitness identification, and the two false exculpatory statements that he gave while he was hospitalized, would have surely resulted in his conviction.

## Conclusion

The petition is denied.

**SO ORDERED.**

Brooklyn, New York
August 9, 2011

*Edward R. Korman*
Edward R. Korman
Senior United States District Judge

8